GEORGE CETENICH vs. SARAH JANE FUVICH et al.

FEBRUARY 8, 1918.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

(1)  Resulting Trusts.
Evidence considered and held to establish a resulting trust.

(2)  Resulting Trusts.
A resulting trust which arises by operation of law, may be proven by parol testimony.

(3)  Laches.
The question of laches must be decided upon the circumstances of each particular case.
Complainant, an illiterate man, unfamiliar with business and with implicit confidence in his wife, whose rights in realty remained undisputed for many years until her last illness which covered a period of twenty months, cannot be deemed guilty of laches in failing to assert such rights under the unsuitable conditions which then prevailed.

BILL IN EQUITY to impress a trust. Heard on appeal of respondents and appeal dismissed.

VINCENT, J. This is a suit in equity brought by George Cetenich asking to have a trust declared in his favor in one-half of certain property standing in the name of Mary G. Cetenich at her decease. The complainant, it is claimed, was lawfully wedded to the said Mary G. Cetenich, but however that may be he lived with her for many years apparently in the belief that he was her lawful husband. The property in question consists of four parcels of real estate situated in the city of Providence and certain personal property.

The respondents are Washington R. Prescott, executor and trustee under the will of Mary G. Cetenich, Sarah J. Fuvich and Walter H. Powell, children of the said Mary by former marriages and her sole beneficiaries under her will. Nicholas Fuvich, the husband of Sarah, is also included as a party respondent.

The complainant seeks relief against these respondents on the ground that equity should impress a trust in his favor

upon one-half of said property because before his marriage to the said Mary G. Cetenich, and under an agreement with her, he turned over to her substantially all of his earnings which she was to save and invest for him, and further because under a subsequent agreement the money so turned over was combined with other moneys belonging to her and used in the acquirement of the real and personal property before alluded to, the title of which was taken in her name. The complainant further alleges that his wife, Mary G. Cetenich, was a shrewd woman, possessed of keen business ability and that she took advantage of his illiteracy and abused his complete dependence upon and confidence in her in the transaction of the business connected with these property matters.

The case was heard in the Superior Court upon bill, answer, replication, oral testimony, and agreed issues of fact and a decision was rendered granting the complainant's prayer as to two of said parcels of real estate, namely, those situated at 415 and 171 South Main street, and incidentally as to one-half of the net rents and profits of said two estates from the date of the death of the said Mary G. Cetenich. The court also granted to the complainant an accounting in the matter of these two estates including the net rents and profits accruing therefrom since the death of Mary but denied him relief as to the personal property and the other two parcels of real estate mentioned in his bill.

The cause is now before this court on the respondents' appeal from the decree entered in the Superior Court in accordance with the decision before mentioned. The only question now before us is whether Mary G. Cetenich, at the time of her death, held one half of the properties located at 415 and 171 South Main street in trust for the complainant.

The complainant had been a sailor and fireman and at the time when he first met Mary Grace Powell, afterwards Mary G. Cetenich, he was employed on one of the steamers of the Winsor Line running between Philadelphia and Providence. He met Mary in December, 1898, in a small

candy and cigar store, which she conducted, on Wickenden street, in Providence, where he went to buy a cigar. Mary had two children, the respondent Sarah Fuvich, whose maiden name was Morby, then about eight years of age and Walter Powell aged about four years. She called both of these children Powell. She represented to the complainant (1) that she was a widow and that her husband Powell was dead. A week later when the complainant returned to Providence he visited Mary again, proposed marriage and was accepted. When he returned from his next trip, the following week, he saw Mary again and in the course of conversation she proposed to him that he should turn his money over to her and that she should save it for him, and that when a chance presented itself they would buy some property. To this arrangement the complainant agreed and immediately handed to her $20, and thereafter continued to turn over to her substantially all of his wages and other money. His expenses were extremely small as he received his board and lodging on the boat, had very few clothes and used but trivial amounts for personal expenses. During their engagement of a year and eight months the complainant turned over to Mary substantially all of the earnings which he received from his several employers, The Winsor Line, Providence Tow Boat Company and Fletcher's yacht, amounting to some $40 or $50 a month, exclusive of his board. He also turned over to her during this period certain salvage money as well as other moneys which he received for working overtime. He usually turned over his pay envelopes without opening them. At the end of a year and seven months after their engagement his money had accumulated in her hands to the amount of substantially $1,000.

On July 13, 1900, certain real estate at 415 South Main street in Providence was purchased. The deed was made to Mary as grantee. The purchase price was $2,500, of which $2,000 was paid in cash and $500 by mortgage on the property. The only property which Mary was then known to possess was an estate in Rehoboth, worth about $1,000,

subsequently sold in November, 1898, for about $900; and $1,000 deposited in the Providence Institution for Savings in January, 1899, about a month after she and the complainant had become engaged and he had begun to turn his wages over to her. This deposit of $1,000 was withdrawn on July 13, 1900, the date when the property at 415 South Main street was purchased.

Upon the acquisition of this property which consisted of a two story building with stores in front and a smaller building in the rear, the upstairs part was arranged for a rooming house and some second-hand furniture was purchased therefor.

About August 14, 1900 the complainant and Mary went through a ceremony of marriage in Boston, returning and making their home at 415 South Main street, Providence. Later a large four-story building containing three stores and some twenty-five rooms was erected on this property. The upper part of the premises was conducted as a rooming house down to the time of Mary's death on December 15, 1914. Until February, 1913, the complainant labored, in regular outside employment, either all day or all night, and gave all of his Sundays, holidays, evenings and other spare time to the care of the rooming house and the other property. He scrubbed floors, made beds, repaired plumbing, painted, tended the fires, collected rents, and made himself generally useful. He was handy with tools, had a workbench for steam fitting in the basement and a set of plumber's tools. During three years when he was in the employ of the Providence Tow Boat Company he received for overwork sufficient coal and wood to supply the house, bringing it home at night upon his back.

In 1913, after Mary became paralyzed, he gave up his outside work and devoted himself to her care and the care of the rooming house during her long illness of some twenty months, besides doing washing, cooking, scrubbing, making beds, tending furnaces, collecting rents and making repairs.

Altogether the complainant's wages which he turned over to Mary from August 14, 1900 to February, 1913, aggregated about $10,000.

In 1901 the city of Providence widened South Main street and in so doing took twenty feet from the front of the property at 415, for which it paid to Mary $5,300. $1,000 of this money was spent in moving back and reconstructing the building, $2,500 was used in purchasing certain property at 171 South Main street on July 2, 1902. From time to time mortgages were placed upon these estates to get funds for buildings and improvements thereon and for the purchase of other real estate. All of such mortgages, however, were discharged before Mary's death. On October 16, 1903, Mary made another purchase of property located at 455 South Main street; on June 4, 1911, obtained an estate on Shambo Alley; on June 1, 1908, acquired property at 162 Smithfield avenue; and in November, 1908, a strip adjoining the 415 South Main street property, which she purchased for $1,600, being the proceeds of a mortgage on the properties at 415 and 171 South Main street. The deeds of all of these properties were taken in Mary's name as grantee. In the four mortgages on the properties at 415 and 171 South Main street which were made after August 14, 1900, when the complainant and Mary were living together as man and wife, the complainant was described as a joint mortgagor and he was also a co-maker of the mortgage notes, he executing them by making his mark.

The real estate standing in Mary's name on November 15, 1914, the date of her death, comprised 415 and 171 South Main street, 162 Smithfield avenue and a strip of land adjoining 415 South Main street. These properties cost altogether about $33,000. All of the business relating to the acquisition and improvement thereof was transacted by Mary in her own name. In addition to this real estate Mary's personal estate, at the time of her decease, was inventoried at upwards of $13,000.

Her will made in 1901 excluded the complainant and left all of her property to the respondent Prescott in trust for the respondents Sarah Fuvich and Walter Powell, sole beneficiaries. This will, which furnishes some evidence of an early intent on the part of Mary to absorb the interest of the complainant in the property for the benefit of her children, was probated in the Municipal Court of Providence on November 24, 1915. From the decree of that court the complainant took an appeal which, however, he failed to prosecute in the Superior Court.

The complainant during all the years he knew and lived with Mary was sober and industrious, but absolutely illiterate, not being able either to read or write. Mary was by far the complainant's superior in intelligence. She was a sharp, shrewd woman, more than ordinarily keen and clever in business and property matters. She was a woman who did her own thinking and kept her own counsel. In all business transactions she first decided what she wanted to do and then directed her attorney and others in carrying out her plans.

In addition to these facts, concerning which there seems to be little or no conflict, the complainant introduced testimony to the effect that he and Mary got along well together and that the relations between them were pleasant; that on many occasions she spoke highly of him; that during her last illness he gave her the best care of which he was capable and that at all times he trusted her implicitly and had complete confidence in her and did whatever she wanted him to do.

It is also in evidence that early in the summer of 1900 Mary said to him, "I got a chance—we got a chance to buy a house," and that she took him to see the property at 415 South Main street, asking him if he was satisfied with it and, upon his giving an affirmative reply, she further said, "we buying this. Half is yours and half is mine;" that she also told him that it was purchased in his name and hers, that each paid one-half of $2,000, the cash payment upon this

property; that she further said to him later, "we buying this piece of property. We pay $2,000 and $500 on a mortgage;" that the complainant's and Mary's money bought this property, that she told him half was his and half was hers and that they always regarded the property with its improvements as half hers and half his. The complainant further testifies that when the $5,300 was received from the city of Providence in 1902 that he and Mary both regarded the money as belonging to them equally, that she always told him it was half his and half hers. That the $1,000 of this money which was spent in moving back and altering the building they both treated as their joint money and understood that it was being used to fix up property which they owned together; that when they were contemplating spending $2,500 of this money for the purchase of the property at 171 South Main street she took him to see it, saying, "we buy this house," at the same time telling him that half was his and half was hers and that it was in his name and hers, and that she had always told him that the property with its improvements was half his and half hers and he had always so regarded it; and that Mary told him further, "we work together and we save money. When we get old we don't have to ask anybody for nothing;" that when she was taken ill she asked him to give up his work and come home and take care of her, saying, "you don't need to work any more. We got enough." It also appears that Mary stated in the presence of others that the complainant had turned over his wages to her for investment and that he was the owner of half of all the property; that his only knowledge regarding the acquirement and management of the property came from Mary who always talked things over with him.

In contradiction of this evidence, the respondents sought to prove that the complainant and Mary were not legally married; that their relations were unfriendly and not confidential; that the earnings he turned over to her were not to be saved for him and invested but were intended as a

8

gift for her or for the support of her family and that they were not used in the acquirement of the estates at 415 and 171 South Main street.

Upon the testimony as presented the Superior Court found that the complainant through his ignorance and his implicit reliance upon his wife was not concerned as to who held the record title to the property; that Mary transacted all the business relating to the purchase, management and improvement of the estate in question and that George took no part therein; that George always turned over to her his pay envelope intact; that from the time of Mary's engagement to George in December he, at her suggestion, turned over his pay to her upon the agreement on her part, "If you will turn your money over to me, I save it for you," and "the first time we have a chance we buy some property;" that George's regular wages plus salvage money prior to July 13, 1900, amounted to between $870 and $900, besides some compensation for his work over time; and that he had practically no expenses; that, when she became engaged to George, Mary owned a piece of real estate in Rehoboth worth about $1,000, and had a deposit of $1,000 in the Providence Institution for Savings, there being no evidence that she had any other property; that after 1900 Mary displayed great money-getting capacity; that she was more than ordinarily clever; a keen trader, shrewd and foreseeing; that George was intellectually sluggish, but faithful, sober, industrious and generally did as she wanted him to; that during his whole married life he worked steadily at various jobs in the daytime and around the premises nights and Sundays; that in July, 1900, Mary told George, "I got a chance" and they went together and examined the property at 415 South Main street; that she asked him if he was satisfied, to which he replied that he was and she bought it telling him, "it is half yours and half mine;" that substantially half of the cash payment of $2,000 was the money of George and that such contribution was for a definite portion of the estate.

The Superior Court further found the fact to be that George was not a joint owner with Mary in the rooming house business but that Mary took the title to 415 South Main street at the time of the purchase of that property and thereafter held it as trustee, one-half for George and one-half for herself; that the property at 171 South Main street was purchased and improved with money paid by the city of Providence for the cutting off of a portion of 415 South Main street, in widening that street, and that the trust originally attaching to 415 South Main street also attached to 171 South Main street and that there is no traceable connection between these two trust properties and any other property or funds belonging to Mary.

From an examination of the testimony we cannot say that the findings of fact by the trial court above outlined are unwarranted. In the case of *Reynolds* v. *Blaisdell*, 23 R. I. 16, it was held that to establish a trust of the character here sought, it was necessary to prove two facts: "First, that the money or consideration paid for the conveyance to the nominal purchaser was the money or property of the claimant; and, secondly, that the claimant, while directing or permitting the conveyance of the legal title to the nominal purchaser, intended to retain the beneficial interest in himself." The bill in that case was dismissed because the proofs failed to bring the case within the scope of the above requirements.

We think that there is testimony in the case at bar showing that the complainant contributed one-half of the money for the original purchase of the estate 415 South Main street and that he intended to retain his interest therein.

The respondents have referred in their brief to express trusts and resulting trusts. Numerous authorities might be cited to the effect that the statute of frauds operates to defeat the establishment of an express trust unless it is evidenced in writing and that a resulting trust which arises by operation of law may be proven by parol testimony. When a grantee pays the purchase money from his own funds

and takes the deed in his own name alone some writing is necessary to establish an express trust, but when the purchase money is furnished by one party and the deed taken in the name of another a resulting trust is established in favor of the one who pays the money, the controlling question then being the ownership of the money which can be shown by parol evidence. *Shaw* v. *Shaw*, 86 Mo. 594; *Towle* v. *Wadsworth*, 147 Ill. 80; *Dudley* v. *Bachelder et als*, 53 Me. 403; *Whitley* v. *Ogle*, 20 Atl. 284 (N. J.) In 1 Perry on Trusts (6th Ed.) § 137, the author says: "The transaction out of which a trust results may be proved by parol. The statute of frauds extends to and embraces only trusts created or declared by the parties, and does not affect trusts arising by operation of law. Indeed, such trusts are specially excepted in the statute of frauds of most States. The exception, however, was omitted in the statute of Rhode Island; but Mr. Justice STORY held that the omission was immaterial, as such trusts were excepted in the nature of things. It follows that a party setting up a resulting trust may prove by parol the agreements under which the estate was purchased, and he may prove by parol the actual payment of the purchase-money by himself, or in his behalf, although the deed states it to have been paid by the grantee in the conveyance."

The respondents have discussed both in brief and argument the question of the validity of the marriage between Mary and the complainant.

The decree of the Superior Court, from which the respondents have appealed, establishes a trust in favor of the complainant in the two estates, 415 and 171 South Main street. The question as to whether the contributions of the complainant made after marriage were contributions made to the "common pot" so-called, or to the wife in trust to be invested for his benefit is not covered by the appeal and is not therefore before us for consideration. The question now is, was the Superior Court in error in impressing a trust upon the two estates mentioned? The moneys of the complainant

which he claims went into these estates were turned over to Mary before, and under an agreement between them which preceded, the marriage. In this view we fail to see how any determination as to the legality of the marriage would be of any importance in the consideration of matters occurring prior thereto.

The respondents claim that the complainant has been guilty of laches which should bar him from the relief which he seeks. There is no arbitrary rule by which the question of laches may be determined, that question must be decided upon the circumstances of each particular case; 16 Cyc. 152. What might amount to laches in one case might in another be excusable delay. In the case at bar we cannot say that the complainant was guilty of laches. He was an illiterate man imbued with an implicit confidence in his wife and unfamiliar with business affairs. He had been a sailor for many years and the habit of obedience which he had doubtless acquired seems to have followed him in his marital relations and may have been responsible for his ready compliance with the commands and wishes emanating from the more masterful mind of his consort. He appears to have recognized and appreciated the superiority of his wife in the conduct of all matters relating to the purchase and improvement of the property in question and he saw no reason for any open assertion of his rights so long as they remained undisputed. When, according to the testimony, it must have become known to him during his wife's last illness that she had ignored or repudiated his rights in the property he could not be said to have been guilty of laches in failing to assert such rights under the unsuitable conditions which then prevailed.

We think that the testimony is sufficient to sustain the finding that the complainant's money went toward the purchase of a definite one-half interest in the estate 415 South Main street, and that the profits arising from that property were applied to the purchase of the other estate 171 South Main street, whereby the rights of the complainant were extended and became attached to the latter estate.

The respondents' appeal is dismissed, the decree of the Superior Court is affirmed and the cause is remanded to said court for further proceedings. .

*Harry C. Curtis, Baker & Spicer,* for complainant.
*Washington R. Prescott, George Farnell,* for respondents.