DECISION
Before this Court for decision is the motion for summary judgment of defendants Michael Voccola, in his capacity as Executor for the Estate of Frederick Carrozza, Jr., Angela Giguere, and Christine Giguere-Carrozza. This Court's jurisdiction is pursuant to G.L. 1956 § 82-14.
 FACTS AND TRAVEL
This case involves a familial dispute and several properties. The plaintiffs seek to impose a resulting trust on certain properties owned by the late Frederick Carrozza, Jr. (Fred Jr. or decedent). Alternatively, the plaintiffs seek a declaration that a partnership existed between plaintiffs and decedent. The essential allegation of the plaintiffs' complaint is that the decedent's father, Frederick Carrozza, Sr. (Fred Sr.), purchased the subject four properties and titled them in the name of the decedent to hold in trust for the benefit of the Carrozza family. A quarrel ensued between the decedent and his father over the decedent's sale of property on Broadway in Newport, Rhode Island to pay decedent's debts which resulted in an estranged relationship. Without reconciling Frederick Carrozza, Jr. died leaving his estate — including the four subject properties[1] — to his wife, defendant Angela Giguere, and his adopted daughter, defendant Christine Giguere-Carrozza.
Although there is no "paper trail" of the monies allegedly contributed by Frederick Carrozza Sr., Fred Sr. testified that he provided the money for the purchase of each property at issue. Fred Sr. claims to have furnished $25,000 toward the purchase of the Post Road property and that the remainder of the purchase price was financed. (Dep. of Fred Sr. at 17.) The condominium at River Farm was acquired after Fred Sr. advanced the developer some funds. Allegedly, the developer went "belly up" and as repayment to Fred Sr. for the "loans," the developer conveyed a condominium unit to Fred Jr. (Dep. of Fred Sr. at 20-21.) However, Fred Sr. admitted in his deposition that Fred Jr., the decedent, had purchased the Prospect Hill property with his own money.[2] (Dep. of Fred Sr. at 24.) With respect to the Bellevue Avenue property, Fred Sr. claims that he provided a $60,000 check and that the remainder of the purchase price was financed. (Dep. of Fred Sr. at 15.) Fred Sr. later testified that his sister Doris loaned the money to Fred Jr. for the purchase of the Bellevue Avenue Property. (Dep. of Fred Sr. at 56.) Philip Carrozza, Fred Sr.'s other son, also testified that Doris had provided the purchase money for the Bellevue Avenue Property. (Dep. of Philip Carrozza at 27.)
According to Fred Sr., the properties were titled in Fred Jr.'s name so that in the event of Fred Sr.'s death, the family would be cared for. (Dep. of Fred Sr. at 27.) However, because Fred Sr. "didn't want to tell everybody what [he] had," the parties did not memorialize their arrangement in the form of a trust — this decision was made against the advice of legal counsel. (Dep. of Fred Sr. at 27.) Thus, Fred Sr. trusted Fred Jr. to hold title to the properties for the benefit of the family — Fred Sr., his four children, and Fred Jr.'s mother. (Dep. of Fred Sr. at 28.)
Unfortunately, the relationship that existed between Fred Sr. and Fred Jr. soured. In 1997, Fred Jr. invested substantial monies in the stock market in a company named Oxford Health. The stock suffered a steep decline which caused Fred Jr. to suffer a substantial loss on a margin call. In response, Fred Jr. sold property on Broadway in Newport which was titled in his name without the knowledge or permission of his father. (Dep. of Fred Sr. 45-49.) At some point during the same time period, Fred Sr. had quitclaim deeds drafted for the properties because he "wanted [the properties] back." (Dep. of Fred Sr. at 29-30.) Fred Jr. refused to execute the quitclaim deeds. (Dep. of Fred Sr. at 31.) After the initial refusal, Fred Sr. "never could catch up with [Fred Jr.]." (Dep. of Fred Sr. at 31.) The father and son became estranged and did not speak for several years and did not reconcile before Fred Jr.'s death in 2002. In the meantime, Fred Jr. married and adopted his wife's daughter, both of whom inherited the properties at issue. This action ensued.
 STANDARD OF REVIEW
"Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v. Burrillville Racing Ass'n,603 A.2d 317, 320 (R.I. 1992) (citations omitted); Super. R. Civ. P. Rule 56(c). When the moving party sustains its burden, "[t]he opposing parties will not be allowed to rely upon mere allegations or denials in their pleadings. Rather, by affidavits or otherwise, they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact."Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998) (citing St. Paul Fire Marine Ins. Co. v. Russo Bros., Inc.,641 A.2d 1297, 1299 (R.I. 1994)).
During a summary judgment proceeding "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano, 603 A.2d at 320
(citing Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980)). "Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact." Capital Props. v. State,749 A.2d 1069, 1080 (R.I. 1999) (citing Palmisciano,603 A.2d at 320). "`Summary judgment should be granted only if an examination of the pleadings, affidavits, admissions, answers to interrogatories, and other materials viewed in the light most favorable to the party opposing the motion reveals no genuine issue of material fact.'" Stone v. Green Hill Civic Ass'n,Inc., 786 A.2d 387, 389 (R.I. 2001) (quoting Nichola v. JohnHancock Mut. Life Ins. Co., 471 A.2d 945, 947-48 (R.I. 1984)).
 DISCUSSION
The defendants assert that the plaintiffs' claim of a trust is barred by the statute of frauds.[3] Further, the defendants contend that because there is no evidence supporting the claim of a partnership, the plaintiffs cannot recover under that theory.
Resulting Trust
While an express trust must be set forth in writing, a resulting trust does not require written proof. Desonoyers v.Metropolitan Life Ins. Co., 108 R.I. 100,110, 272 A.2d 683, 689
(1971). A resulting trust arises when an express trust fails either at the outset or subsequently. Id. With regard to property, "when purchase money is furnished by one party and the deed taken in the name of another a resulting trust is established in favor of the one who pays the money, the controlling question then being the ownership of the money which can be shown by parol evidence." Cetenich v. Fuvich,41 R.I. 107, 116, 102 A. 817, 821 (1918). Furthermore, "there must be clear, full and convincing evidence" that the contributor intended to retain a beneficial ownership in the property conveyed. Desonoyers 108 R.I. at 111, 272 A.2d at 689. A rebuttable presumption of a gift arises when, "the consideration moves from a parent or one who stands in loco parentis to the nominal purchaser." Reynolds v. Blaisdell, 23 R.I. 16, 19,49 A. 42, 42 (1901); see also, Roseman v. Sutter,735 F. Supp. 461, 465-66 (D.R.I. 1990) (evidence failed to rebut the presumption that parents' contribution of $50,000 down payment was a gift).
Because of the familial relationship between Fred Sr. and Fred Jr., the presumption arises that any money advanced by Fred Sr. was a gift to Fred Jr. Concerning both the Bellevue Avenue and Prospect Hill Properties, Fred Sr.'s testimony does not support the imposition of a resulting trust. Fred Sr. admitted that the Prospect Hill Property was purchased with Fred Jr.'s funds. (Dep. of Fred Sr. at 24.) Furthermore, both Philip Carrozza and Fred Sr. confirmed that "Aunt Doris" loaned Fred Jr. the purchase money for the Bellevue Avenue Property. Therefore, viewing the facts in the light most favorable to Fred Sr., there is no evidence that Fred Sr. contributed any money to the purchase of either the Prospect Hill Property or the Bellevue Avenue Property. Therefore, Fred Sr.'s claim of a resulting trust as to both properties fails.
"[A] mere general contribution toward the purchase price by itself will not establish a resulting trust." Cutroneo v.Cutroneo, 81 R.I. 55, 59, 98 A.2d 921, 923 (1953); Campanellav. Campanella, 76 R.I. 47, 52, 68 A.2d 85, 88 (1949) ("[N]o resulting trust arises where a person furnishes only a part of the purchase price of the property unless his part is contributed in payment of some definite aliquot part thereof.") Applying these principles to the case at bar, as a matter of law, a resulting trust cannot be imposed upon the Post Road Property because Fred Sr. claims to have contributed only $25,000, yet there is no evidence to suggest that at the time of the conveyance Fred Sr., individually, intended to retain a definite fractional interest in the property. Cutroneo, 81 R.I. at 59,98 A.2d at 923 ("There must be clear, full and convincing evidence that at the time of the conveyance it was the intention and understanding that the contributor was to have the beneficial ownership in the whole or in a definite fractional part."). Fred Sr.'s claim is that Fred Jr. was to hold the properties for the benefit of the Carrozza family which does not satisfy the requirement that a resulting trust exist for the benefit of the settlor individually.
Finally, the alleged circumstances surrounding the River Farm condominium are not enough to find a resulting trust. Fred Sr. did not advance or produce any funds for the purchase of the condominium; rather, the condominium was conveyed as repayment to Fred Sr. for a loan. Fred Sr. testified as follows:
 "The developer, Anthony Delvicario, ran into some financial problems. I loaned him some money, and unfortunately he went belly up. But before he did, he protected me so that — he had the model apartment, and that should satisfy the money that I give him, or I had given him. And before he filed — or before he sold it to another developer, that was part of the deal, that I would — I couldn't take possession of the unit for two years, until the subsequent developer finished developing the property. And at that time, Freddy was trying to buy a house down here in Newport. . . . In Middletown. And he showed it to me, and I said, `I got the apartment coming up in a couple of weeks. Take a look at it. It's magnificent.' It really was. And he said, `Gee,' he said, `that's beautiful. I'll take that and I'll live there. I'll use it for commuting.' I said, `No problem. If not, I will let Freida live there. All she has to do is pay the taxes and the insurance.' `No,' he said, `I want to live there.' And that's how I transferred it over." (Dep. of Fred Sr. at 20.)
The circumstances surrounding the conveyance of the condominium unit, as relayed by Fred Sr., do not support any reasonable inference that Fred Sr. intended to retain beneficial ownership or a definite fractional interest in the condo. The transaction as described by Fred Sr. does little to rebut, and more to support, the presumption that the conveyance of the condo was a gift from a father to a son. Thus, viewing the facts in the light most favorable to the nonmoving party, the defendants are entitled to summary judgment with respect to the claim for an equitable or resulting trust as to all properties.
Partnership
Pursuant to G.L. 1956 § 7-12-17, a partnership is defined as "an association of two (2) or more persons to carry on as co-owners of a business for profit." Section 7-12-18 provides a list of rules for determining whether a partnership exists;[4] a written agreement is not required. The determination of whether a partnership exists is largely dependent upon an examination of the totality of the circumstances. Southex Exhibitions, Inc. v. R.I. Builders Assn.Inc., 279 F.3d 94, 100 (1st cir. 2002) (interpreting the Rhode Island Uniform Partnership Act).
Fred Sr. and Philip Carrozza[5] contend that a partnership existed between themselves and Fred Jr. and as evidence of such, Fred Sr. relies on the alleged "co-ownership" of the properties at issue in this litigation. Specifically, Fred Sr. claims that he provided the funding for the properties and that the son managed them with both parties exercising control and splitting the profits of any sale proceeds. This assertion is unsupported by the deposition testimony of Fred Sr. Fred Sr. acknowledged that he and Fred Jr. filed separate taxes, did not receive a K-1, and did not share profits. (Dep. of Fred Sr. at 42.) Fred Sr. described his relationship with his son as "like two dancers . . . we put our arms around each other, we loved each other. And I trusted him, and I'm sure he trusted me, until he got sick." (Dep. of Fred Sr. at 42.) As indicated, Fred Sr. and Fred Jr. had a trusting relationship that required no formalities until their falling out over the margin call and Fred Jr.'s decision to sell one of the properties. This relationship does not support the claim that a partnership — an association of two or more persons to carry on as co-owners of a business for profit — existed. Viewing the facts in the light most favorable to the Plaintiffs and drawing all reasonable inferences therefrom, the defendants have met their burden of establishing no genuine issue of material fact and are entitled to judgment as a matter of law.
 CONCLUSION
Based on the foregoing, the defendants' motion for summary judgment is granted. Counsel shall submit the appropriate order for entry.
[1] The properties are located at (1) 103-111 Bellevue Avenue, Newport, Rhode Island; (2) 1101 Post Road, Warwick, Rhode Island; (3) Unit 47, River Farms Condominium, 47 River Farm Drive, West Warwick, Rhode Island; and (4) a parcel of real estate located on Prospect Hill Street, Newport, Rhode Island. Copies of the deeds of each property were submitted by the Defendant as exhibits J through H.
[2] Fred Sr. testified as follows,
 "Q. And can you, again, describe for us how you funded it?
 A. [Fred Jr.] used the moneys that he had collected from rents of property that we owned before, and he said he wanted to buy it, and I said, `Go ahead, buy it. You've got the money.'"
 Q. There's no particular advance of a —
 A. No.
 Q. — particular amount of money from you —
 A. No.
 Q. — to him to acquire it, to give it —
 A. Not on that property, no." (Dep. of Fred Sr. at 24-25.)
[3] It is questionable whether the plaintiffs are pursuing a claim of express trust, but to the extent that they are, such a claim must fail under the statute of frauds.
[4] Section 7-12-18 provides in pertinent part:
 "In determining whether a partnership exists, these rules apply:
 (1) Except as provided by § 7-12-27, persons who are not partners as to each other are not partners as to third persons.
 (2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether the co-owners do or do not share any profits made by the use of the property.
 (3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
 (4) The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference is drawn if profits were received in payment:
 (i) As a debt by installments or otherwise;
 (ii) As wages of an employee or rent to a landlord;
 (iii) As an annuity to a widow or representative of a deceased partner;
 (iv) As interest on a loan, though the amount of payment vary with the profits of the business;
 (v) As the consideration for the sale of a good will of a business or other property by installments or otherwise."
[5] Freida Carrozza and Laurie Carrozza-Conn, sisters of the deceased, conceded in their answers to interrogatories that they were never involved in any partnership with Fred Jr.